IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

| | | |
|---|---|---|
| THOMAS REEDY, | § | |
| Defendant-Petitioner, | § | |
| | § | No. 4:12-CV-271-Y |
| v. | § | (4:00-CR-054-Y) |
| | § | |
| United States of America, | § | |
| Plaintiff-Respondent. | § | |

## REPLY BRIEF

Ms. Saldana, for the Government, states, (p. 11, lines 6-7 of Gov. Resp.) "Therefore their "forensic" examinations have no impact on the evidence found on the computers seized from Reedy's home."

Ms. Saldana appears to be in willful denial as to how this new evidence truly affects everything presented at trial. She aptly demonstrates the ability to twist a statement's meaning to serve her purpose. She is blatantly wrong in her assertions.

Dane Richeson, "expert" witness for the Government (see Pet. Brief in Support, p. 26, lines 44-46, p. 27, lines 1-10), "testifies that emails presented as from the desktop [home computer referenced by Ms. Saldana, p.3, para. 3, p. 11, para. 1, p. 17, para. 1] came through him..." "Further, all of the inflamatory images provided at trial allegedly recovered from computer(s) at Petitioner's residence were captured as evidence by this witness," Dane Richeson. With the server data evidence, never reviewed by Wes Ball, Petitioner could have impeached the

witness with the data manipulation evidence as now found on the Defense copies as well as that denied him by its corruption.

If the integrity of the date/time stamps could be relied on (Pet. Brief in Supp., p. 17, lines 3-5), a review of the home computer(s) evidence (Gov. Resp., p. 11, para. 1) may very well reveal, not only hacking through one of the documented back doors within Windows 98 (see <u>United States v. Winkler</u>, 639 F. 3d 692 (5th Cir. 2011), but that the FBI agent who foraged through Reedy's home computer(s) for hours before bothering to make a backup copy of the drives, was the person who actually made the PaintShop Pro thumbnails (Gov. Reply Brief, p. 17), PaintShop Pro's "Browse directory" function as PaintShop Pro was the default image viewer set for both computers. These settings, along with valid date/time stamps, would prove conclusively and irrefutably Reedy did not create these thumbnails.

The verification of "legal adult status" and validity of a verified customer account were the services Landslide's AVS and KeyZ offered to thousands of adult sites. Due to the nature of adult-oriented businesses, no one under the age of 18 should be viewing adult-oriented content. Ms. Saldana certainly makes it sound in her <u>Brief, p. 11,</u> that everything we touched was associated with child pornography. That could not be further from the truth. The reality is that Landslide and Reedy took affirmative action to prevent viewing as well as the sale of child pornography and much of the evidence to that effect was never brought up at trial due to Wes Ball's ineffectiveness.

Petitioner disputes the Government's assertion (Gov. Resp., p. 17, lines 5-9) that the "evidence" is sufficient to support a

conviction. Ball (Petitioner's attorney) failed to inspect the data tapes he received nor directed an expert to do so. As a result many pieces of exculpatory and impeachment evidence went unseen by Ball and the Court. Examination by a qualified technician has revealed: (1) the date/time corruption of all external file listings (<u>Exhibit M</u>) (2) the Watchdog logs that show restarts to the servers after seizure on the dates 9/9/99 & 9/10/99 on a copy of the servers alledgedly made (backed up and copied) on 9/8/99 (<u>Exhibit N</u>), (3) evidence that attempted restarts of the servers occurred 53 times <u>after</u> alleged back-up copies were made! (<u>Exhibit O</u>), (4) proof that no programming code existed on the Landslide servers for the alleged stationary "Click Here Child Porn" banner focused on at trial (see prosecutor Terry Moore's statement in closing argument at Reedy trial: "That's not just some banner exchange program. That banner was intentionally placed there." (line #, page# unavailable to me) (<u>Exhibit I</u>), (5) evidence of hacking (<u>Exhibit H</u>), (6) programming code that Landslide had instituted a disconnection of the Nympho website. This latter evidence was particularly important because it strongly contradicted the intent element of the charges. The Government went to great lengths to show Reedy was "in it for the money". (see also Gov. Resp., p. 17, line 2). The code (<u>Exhibit C</u>) proves that Nympho, also known as "Lolita World", which brought in the most verification fees to Landslide was removed from the KeyZ system weeks before the raid. New subscribers could not verify through KeyZ and receive access passwords, nor could old subscribers use KeyZ to verify the authenticity of their membership passwords to access beyond Lolita World's front page. Landslide and Reedy

took affirmative action to prevent view of, as well as the sale of, child pornography and it was never brought up at trial by Wes Ball. All of these items either put evidence into doubt or contradicted the element of intent required for conviction. As the Strickland Court said, "Some errors will have had a pervasive effect on the inferences to be drawn from the evidence, altering the entire evidentiary picture." Id.

As for the sites Det. Nelson "accessed" (Gov. Resp., p. 12, para. 2) we don't know if Det. Nelson was re-directed to the appropriate content page(s) once his purchased access was instituted, - insert scenario of choice here - it could be that a disgruntled customer or competitor diverted others to an illegal content page in hopes of getting them (or us) shut down. Ms. Saldana is misleading the Court when she states, "for nearly all the child pornography sites he visited, Det. Nelson bought access to them through Landslide's KeyZ site, each time receiving a confirmation email" (Gov. Resp., p. 15, lines 18-20). KeyZ did not provide a direct link or listing of participating sites. Each site was responsible for their own marketing. The only time KeyZ provided a "link" to any site using the system was when a customer checked/verified the "status" of their user account. The server would indicate to that customer the amount of time remaining on that account and a link to the site it was registered for. The sign-up page associated with any given site was, however, accessed through the site(s) being signed up for...not directly through KeyZ.com. And lest you be mislead about site names suggestive of under-age content, I must point to the evidentiary exhibit, web page posted

at Landslide written by Jason DeFillipo of Hollywood, California, instructing adult content Webmasters in the usage of "puffery" by using suggestive names to market their websites. Obviously some sites with legal adult content used shock value to entice customers to take a look inside their sites. This evidentiary exhibit was presented in the Reedy trial and defines such puffery.

The servers in question (Pet. Brief in Support, p. 26, lines 32-35) were the link to all documentation evidence entered into record. The modification dates of all documentation evidence are now tainted because the Jury and Court could not be sure when files were last modified/manipulated, or by whom, shaking the confidence of the outcome of the trial.

All evidence (Pet. Brief in Support, p. 28, lines 25-35, p. 29, lines 1-27) produced for trial by Nelson (Gov. Resp., p.12, para. 2, p. 17) including video tapes, Web Buddy captures and printed material have a locus in the Landslide database. Once the age verification password was authenticated for a subscriber attempting to enter one of the websites using KeyZ.com, an internal URL at Landslide was programmed to send the subscriber back out again. The Webmaster's Admin page, within the KeyZ.com system allowed Webmasters to change or update both front page address (URL) and/or content page URL at any time. In theory, it should return the subscribers back to the original website. However, it is possible to manipulate that code and send the subscriber off in a totally different direction. Due to the gross forensic mishandling of computer data and backup procedures of the government (as evidenced in the server copies given to the defense) it is impossible to determine the authenticity

of the URL's as being the actual URL's input by the true Webmasters for the sites Nelson claimed to visit. This taint puts all of those images in doubt as they relate to Petitioner or Landslide. Due to the corruption of the files dates, Petitioner could neither deny nor impeach the claims without knowing what data changes were made to the system or at what time.

Petitioner is now aware that computer hackers were inside the Landslide servers manipulating data (Gov. Resp., p.15, para. 1), but due to the corruption of the date/time stamps, Petitioner cannot even determine which files were manipulated or when (Gov. Resp., p. 12, para. 1, para. 2, p. 13, para. 1). As Exhibit I shows, the "Click Here Child Porn" banner was never on the server as a fixed banner and may have appeared as part of the manipulation of other HTML files. Ball would have also discovered that the banners found in the "incoming" directory of the ClicZ.com banner exchange server show they were "uploaded" into the incoming directory after the computer was seized and in the possession of U.S. authorities 9/8/99. (Exhibit Q) (Note: the evidence gathered and submitted by Jim Bates reflects the European dating system, i.e. 8/9/99...as the forensic examiners reside in the U.K.) (see Brief in Support, p. 32, lines 4-12). Exhibit H is offered as a hearsay exception, statement against interest. In this magazine article, Brazilian hacker, Antonio Tornisrello admits that he penetrated Landslide's servers and manipulated data to commit fraud and theft (see p. 21 of article). We can never know how this was accomplished because the files he had to manipulate to pull it off all read 9/8/99 now. And this is the one known hacker. The corruption prevents discovery of other hacks

that negate Reedy's intent. Even the 5th Circuit recognizes the danger to the innocent posed by "spam, viruses and hackers", <u>United States v. Winkler</u>, 639 F. 3d 692 (5th Cir. 2011). Financial data used at sentencing, web code to redirect customers from KeyZ to whatever site, and emails exchanged were all put in doubt by the corruption and computer clock resetting while in Government's control...and it was never reviewed by Wes Ball!

Ms. Saldana, in her Reply (p. 16-17, para. 2), quotes: "He said he would view the offending website and then tell the complainer to contact his local police department; however, he would not cease selling subscriptions to the offending site. Evidently the money was just too good."

This is simple untrue. (Pet. Brief, p. 6, lines 9-10, lines 29-31). Respondent ignores the inordinate amount of monetary loss, not gain, these sites represented. Had Wes Ball bothered to review this financial data, found on the server, affirmative rebuttals were available. Also, it is easily disproved by the fact that after learning of illegal content on the website of his largest paying client (Lolita World), Petitioner shut the site down. See <u>Exhibit C</u>; (Brief in Support, p. 4). Because of the technical problems associated with simply "deleting a site" from the system, Reedy directed his programmer, Thomas Hughes, to rewrite the code to allow a site to be blocked, preventing its participation in our services (Pet. Brief, p. 4, lines 5-15). Had Petitioner's attorney obtained uncorrupted server data, he could have proven exactly when this occurred. He could also have shown that he attempted to purge the online classifieds, and when. (Pet. Brief in Support, p. 5, para. 2);

that he developed a program, Snitch-CGI, to eliminate offensive banners ((Pet. Brief in Support, para. 3 and <u>Exhibit E</u> (Note: this capture from the "wayback machine" would be separately discoverable within the ClicZ.com server data that attorney Wes Ball failed to review)); and that he shut down the banner exchange system entirely. Although evidence of these actions were readily found on review of said server data, the timelines of exactly when these measures were implemented are destroyed.

The assertion that Bates and Rothery's claims are incomplete and unsubstantiated are in error. This Brief has already addressed Ms. Saldana's claim that Bates' forensic examination is incomplete because, as she claims, an examination of the home computers was not performed. Hopefully, due to the revelations of gross mishandling of the computer forensic evidence, a hearing will be ordered and this data can be examined. It is uncontested that Wes Ball failed to examine, or cause to be examined, the totality of computer data evidence, the majority of which is in the prosecutor's possession.

As for Mr. Bates and Rothery's claims being "unsubstantiated", Petitioner's Brief in Support (p. 11, 12 and 13 through line 4) gives weight to Mr. Bates' findings, as the Brief explains, Reedy reviewed and found the initial problem with the server data via email and directed Mr. Bates on a further review. Reedy, who actually wrote the initial programming for all of Landslide's many businesses, is well versed in UNIX programming, so "Reedy" must point out that the Brief in Support was signed by Reedy, as being "True and Correct", and should carry the weight of an affidavit. Likewise, Dr. Sam Type, a government computer expert witness in the U.K. also found corrupted

data and date stamps from an independent copy of the Landslide servers provided to the U.K. by the U.S. Attorneys office. Mr. Rothery's claim that his "forensics evidence indicates that the "Click Here Child Porn" banner did not exist on the Landslide home page (Gov. Resp., p. 12, para. 1) is substantiated in Petitioner's Brief in Support pages 10, 11, 21 (lines 23-25), 29 (lines 12-14) and <u>Exhibit I</u>, since Bates is part of the team Rothery was referencing in his affidavit.

Ms. Saldana saved her best twist of words for last and introduced testimony from U.S. Postal Inspector Steve Huggins (Gov. Resp., p. 16, para. 2). Petitioner told investigators that he received complaints that 3-4 Webmasters were displaying child pornography, that he contacted FBI Agent Frank B. Super concerning these sites and complaints. He also directed his staff to refer complaintants to report the Webmasters responsible to the authorities, forwarding an email to customer service support staff (evidenced at trial) on how to report child pornography, as well as to ask the reporting customer to report the offending site to that site's Internet Service Provider so that it can be shut down. Neither did Reedy say subscriptions to "child pornography sites" represented 30-40 percent of the business. What Reedy did say was that 30-40 percent of Landslide's business came from foreign websites. There certainly was no evidence to support these statements presented at trial. Further, the ineffectiveness of counsel prevented Petitioner from supporting any strategy he might develop to show he did not have intent as he was assisting and cooperating with law enforcement in closing down websites using KeyZ services

that did have child pornography displayed (see Brief in Support, p. 22-23).

The Appellate Court concluded that "Reedy has made a prima facea showing sufficient to warrant a <u>fuller exploration</u> by the District Court on his claim that he received ineffective assistance of counsel based on his attorney's failure to inspect the copies of the computer servers provided to the defense".

So...an overall view of Ball's representation must be revisited. <u>Kimmelman v. Morrison</u>, 477 U.S. 365, 91 L.Ed. 2d 305, 326, 106, S. Ct. 2574 (1986) (see Petitioner's Brief in Support, p. 23-41).

Once again, Petitioner, Thomas Reedy, pro-se, respectfully requests this Court to grant him an Order:

    A. That the Court vacates its earlier conviction on all counts and releases Petitioner immediately.

    B. In the alternative, the Court grants an evidentiary hearing to Petitioner in a timely fashion with any concommitant discovery for same. Additionally, counsel is assigned to Petitioner for purposes of gathering discovery evidence and assistance at the hearing.

    C. Such other or further relief to which the Petitioner is entitled as is considered fair and just by this Court.

Respectfully Sumitted,

Date: 10-14-12

Thomas Reedy
Petitioner, pro-se

I affirm under penalty of perjury that the foregoing is true and accurate.

Thomas Reedy

Affirmation Statement

I hereby affirm that I have served one copy of the foregoing Motion to the attorney for the Northern District of Texas, Fort Worth Division, 801 Cherry St., Suite 1700, Fort Worth, TX 76122, on this __14th__ day of __October__, 2012.

_____
Thomas Reedy

IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

THOMAS REEDY, §
　　Defendant-Petitioner, §
§
§ No. 4:12-CV-271-Y
§ (4:00-CR-054-Y)
v. §
§
§
United States of America, §
　　Plaintiff-Respondent. §
§

REPLY BRIEF TO GOVERNMENT'S RESPONSE TO
SUCCESSIVE MOTION UNDER 28 U.S.C. § 2255

Respectfully Submitted,

THOMAS REEDY 25673-177
pro-se
U.S. Penitentiary
P.O. Box 1000
Marion, IL 62959

## TABLE OF AUTHORITIES

U.S. v. Winkler, 639 F. 3d 692 (5th Circuit 2011).........P. 2,7

Strickland v. Washington, 466 U.S. 668 (1984)............. P. 4

Kimmelman v. Morrison, 477 U.S. 365 (1986)................ P. 10




Thomas Reed / 25673-177
U.S. Penitentiary
P.O. Box 1000
Marion IL 62959

US POSTAL DISTRICT
N. DIST. OF TX
FORT WORTH DIVISION
2012 OCT 18 AM 10:40
CLERK OF COURT

⇔25673-177⇔
District Court Clerk
501 W 10TH ST
FORT Worth, TX 76102-3673
United States

Warden
United States Penitentiary
Marion, Illinois 62959

Date: __OCT 1 3 2012__

The enclosed letter was processed
through special mailing procedures
for forwarding to you. The letter has
neither been opened nor inspected.
If the writer raises a question or
problem over which this facility has
jurisdiction, you may wish to return
the material for further information or
clarification. If the writer encloses
correspondence for forwarding to
another addressee, please return the
enclosure to the above address.