IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

THOMAS REEDY                    §
                                §
VS.                             §    CIVIL NO.4:12-CV-271-Y
                                §    (Criminal No.4:00-CR-054-Y)
UNITED STATES OF AMERICA        §

ORDER DISMISSING UNAUTHORIZED CLAIMS,
ORDER RESOLVING SUCCESSIVE MOTION FOR RELIEF UNDER 28 U.S.C. § 2255
and ORDER DENYING CERTIFICATE OF APPEALABILITY

Now pending before the Court is defendant Thomas Reedy's successive motion seeking relief under 28 U.S.C.§ 2255 filed on April 30, 2012. As the Court noted in its order of May 15, 2012, the only successive claim that the United States Court of Appeals for the Fifth Circuit authorized Reedy to file in this Court was the "claim that he received ineffective assistance of counsel based on his attorney's failure to inspect the copies of the computer servers provided to the defense." The Court already dismissed all other grounds Reedy listed in the successive § 2255 motion filed here,[1] because he had not obtained authorization/permission of the court of appeals.  The Court then permitted Reedy to file a 42-page brief in support of the successive motion under § 2255, along with a 77-page appendix of exhibits. The government filed a response to the  successive § 2255 motion, brief and exhibits, and Reedy has also filed a reply. Thus, now ripe for resolution is the question

_____

[1]Reedy did not file the same successive motion under § 2255 in this Court that he had presented to the court of appeals when seeking their permission/authorization.

of whether Thomas Reedy is entitled to have the § 2255 motion considered under the standards of 28 U.S.C. § 2255(h)(1).

*Dismissal of Unauthorized Claims*

Before turning to review of the claim permitted by the court of appeals, this Court must once again dismiss additional efforts by Reedy to add claims in this proceeding that were not authorized by the court of appeals. In this regard, even after the Court dismissed the unauthorized claims Reedy listed in the successive § 2255 motion, in the subsequent brief Reedy filed with the Court's permission, he has woven into his arguments additional claims of ineffective assistance of counsel. In the brief, Reedy alleges that counsel Wes Ball was ineffective for: (1) failing to move to suppress the evidence gathered as a result of the (allegedly) corrupted servers; (2) falling below an objective standard of reasonableness given the complexity of the evidence, issues, and possible defenses in the case;(3) failing to effectively understand the complexity of the issues and evidence; (4) failing to understand important programming code or internet related issues in order to properly voir dire and then cross examine the government's witnesses; (5) failing to conduct more discovery or arrange for an expert witness to contradict and impeach the prosecution's witnesses, inspect the copies of servers provided for completeness, or demand copies of the QuickBooks programs captured from the business; (6) failing to recognize that one of his former clients

2

was a witness for the government; (7) failing to file a motion for new trial; (8) failing to properly handle the plea offer made by the government prior to trial; and (9) failing to engage or call an expert witness on behalf of the defense who could have examined the server evidence and developed impeaching items for all the claims listed above. (Reedy's June 11, 2012, Brief at 34-40.) Because this listing of additional claims of ineffective assistance of counsel is beyond the scope of what the court of appeals permitted Reedy to file in a successive § 2255 proceeding, all such claims must be dismissed as filed without permission of the court of appeals.

*Issue*

Reedy claims that newly discovered evidence shows that his attorney, Wes Ball, provided ineffective assistance of counsel in failing to inspect copies of computer servers received as part of the discovery process, causing counsel to miss what Reedy characterizes as "crucial impeachment and exculpatory evidence." (Reedy Brief at 1.) Reedy supports his motion and brief with an appendix containing reports, affidavits, and emails from Terrence James Bates and Brian Rothery. Bates claims to be an expert in computer forensics, and his reports show his alleged forensic analysis of Landslide's computers and servers in connection with defending persons prosecuted in the United Kingdom for allegedly purchasing access to child pornography after Reedy's trial and conviction. (Reedy Appendix at 29, 46, 59.) Rothery notes that he

is a "writer living in Ireland" and the coordinator of a group or class action of people "wrongfully accused because of the US Landslide case." (Reedy App. at 41, 43---Rothery Statement and Affidavit.) Rothery's statement reflects conclusions from alleged forensic analysis and investigation of copies of Landslide's computers and servers apparently conducted as a part of that class action. (*Id.*) Bates and Rothery's analysis was a part of an effort to show that persons prosecuted in the UK either were unaware they were accessing child pornography when they purchased access through Landslide, or that they were the victim of credit-card fraud and identity theft. (Reedy App. at 19, 24, 29, 59.)

Reedy contends the reports, emails, and affidavits from Bates and Rothery show the "copies of computer servers" provided to attorney Ball "were corrupted as reflected by files dates listed as 9/8/1999 on all external files." (Br. at 23.) Reedy argues the 9/8/1999 date "modification" (being the date of the seizure of evidence) wiped out evidence of file modifications "between the internal creation dates of each file and the seizure date." (Br. at 27.) Reedy contends this prevented him from proving the date he allegedly purged the adult classified webpage and closed the banner exchange program, which would have "gone to the issue of intent as a defense strategy." (Br. at 27.) Reedy also contends the alleged corruption evidence would have impeached the government's computer forensic witness because it would have showed his process allegedly

failed to protect the integrity of the seized Landslide servers. (Br. at 29.) He also alleges that being provided corrupted copies prevented him from developing appropriate defense strategies and that the possibility of data manipulation after seizure taints the entire trial. (Br. at 22.) Reedy argues that the evidence of counsel's failure to inspect the copies of computer servers and to discover that they were corrupted clearly and convincingly shows that no reasonable factfinder would have convicted him because the "corrupted servers were the nexus from which every other piece of prosecution evidence flowed and was thereby tainted." (Br. at 23.)

*Standard of Review*

The Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") modified the provisions of 28 U.S.C. §§ 2244, 2254, and 2255 related to successive collateral challenges, making it "significantly harder for prisoners filing second or successive federal habeas corpus motions to obtain hearings on the merits of their claims."[2] The final paragraph of § 2255 states:

> A second or successive motion must be certified as provided in section 2244 by a panel of the appropriate court of appeals to contain –
>
> (1) newly discovered evidence that, if proven and viewed in light of the evidence as a whole, would be sufficient to establish by clear and convincing evidence, that no reasonable factfinder would have found the movant guilty of the offense; or

---

[2] *United States v. Orozco-Ramirez,* 211 F.3d 862, 864 (5th Cir. 2000).

(2) a new rule of constitutional law, made retroactive to cases on collateral review by the Supreme Court, that was previously unavailable.[3]

Although the AEDPA included specific provisions in section 2244 detailing the requirements for successive § 2254 petitions by state prisoners, those details were not included in section 2255.[4] The United States Court of Appeals for the Fifth Circuit, however, determined that § 2255 incorporates the detailed provisions of both § 2244(b)(3)(C) and § 2244(b)(4).[5] Those provisions provide:

> [§ 2244(b)(3)(C)]The court of appeal may authorize the filing of a second or successive application only if it determines that the application makes a prima facie showing that the application satisfies the requirements of this subsection.

> [§ 2244(b)(4)] A district court *shall dismiss any claim* presented in a second of successive application that the court of appeals has authorized to be filed *unless the applicant shows that the claim satisfies the requirements of this section.*[6]

Thus, before a defendant may receive a merits adjudication of his successive § 2255 motion, he must pass through two gates.[7] First, the inmate must present a motion to the court of appeals and

---

[3]28 U.S.C.A. § 2255 (West Supp. 2012).

[4]*See Reyes Requena v. United States,* 243 F.3d 893, 897 (5th Cir. 2001)("When AEDPA amended the various collateral review and habeas corpus statutes, it did not include the details applicable to successive § 2255 motions; rather, it simply referred to the § 2254 procedures detailed in § 2244").

[5]*Id.* at 897.

[6]28 U.S.C.A. §§ 2244(b)(3)(C) and (b)(4)(West 2006)(emphasis added).

[7]*See In re Swearingen,* 556 F.3d 344, 347 (5th Cir. 2009)("Section 2244 establishes two independent gates through which a motion to file a successive petition must pass before the merits will be addressed")(citation omitted).

therein make a prima facie showing that his application to file a successive § 2255 motion satisfies the requirements of § 2255(h).[8]

Reedy has passed through this first gate. The Fifth Circuit concluded that he made a prima facie showing under § 2255(h)(1) on the claim that "he received ineffective assistance of counsel based on his attorney's failure to inspect the copies of computer servers provided to the defense." A prima facie showing is a sufficient showing of possible merit to warrant a fuller exploration by the district court.[9]

The second gate for Reedy is through this Court. The grant by the court of appeals of authorization to file a second or successive motion is "tentative," and the district court "is the second 'gate' through which the [2255 movant] must pass before the merits of his or her motion are heard."[10] The Fifth Circuit has explained: "the district court must dismiss the motion that we have allowed the applicant to file, without reaching the merits of the motion, if the court finds that the movant has not satisfied the requirements for filing of such a motion."[11] A district court "must conduct a 'thorough' review to determine if the motion

---

[8] *In re Morris,* 328 F.3d 739, 740 (5th Cir. 2003); *Reyes-Requena,* 243 F.3d at 897; 28 U.S.C.A. §§ 2244(b)(3)(C) and 2255.

[9] *In re Hearn,* 418 F.3d 444, 445, 447-48 (5th Cir. 2005).

[10] *In re Morris,* 328 F.3d at 741

[11] *Id* (citing *Reyes-Requena,* 243 F.3d at 899).

'conclusively' demonstrates that it does not meet AEDPA's second or successive motion requirements."[12]

Section 2255(h)(1), under which Reedy proceeds, incorporates the common-law actual-innocence exception to otherwise procedurally barred constitutional claims.[13] Because Reedy failed to present this constitutional claim of ineffective assistance of counsel in his original § 2255 motion, he is procedurally barred from having it reviewed on the merits unless he satisfies the requirements of § 2255(h)(1). In essence, Reedy must show there is newly discovered evidence that clearly and convincingly shows his actual innocence. This means that rather than having to show that but for counsel's alleged deficient conduct there is a reasonable probability of a different result under *Strickland v. Washington,* 466 U.S. 668 (1984), Reedy must show "by clear and convincing evidence that no reasonable factfinder would have found [him] guilty."[14] Only if Reedy meets that burden will he be able to obtain relief on his ineffective-assistance claim that is otherwise procedurally barred.

---

[12]*Id.*

[13]*See In re Lampton,* 667 F,3d 585, 589 n. 23 (5th Cir. 2012)(Noting that "Section 2255(h)(1) authorizes the filing of a second or successive petition that contains newly discovered evidence that, if true, constitutes clear and convincing evidence of actual innocence," and observing that a claim of factual or legal innocence does not meet the requirements of § 2255(h)(1); *see also United States v. Scruggs,* 691 F.3d 660, 671 (5th Cir. 2012)("'Actual innocence' is not a free-standing ground for relief")(citing *Matheson v. United States,* 440 Fed. Appx. 420, 421 (5th Cir. 2011)(per curiam)(applying this rule in the § 2255 context)(other citation omitted)).

[14]28 U.S.C.A. § 2255(h)(1)(West Supp. 2012).

*Whether the newly discovered evidence is Clear and Convincing*

Reedy's "newly discovered evidence" consists of reports, affidavits, and emails that claim the backup copies of Landslide's computers and servers provided to defense counsel allegedly (1) contain corrupt date-time stamps for many of the files; and (2) "the 'Click Here for Child Porn' banner did not exist on the Landslide homepage as alleged in the Landslide trials." (Reedy App. 31-39, 41, 49-52, 61.) In his report, Bates explains that the alleged date-time stamp contamination or corruption on the Landslide computers and servers involves an inconsistency between a last-modified date for error-log files and the latest internal dates for events recorded in those logs. (Reedy App. at 59-61.) According to Bates, if error logs show a last-modified date of September 8, 1999, then logic would say that log cannot contain a system event dated after September 8. (*Id.*) In an e-mail allegedly from Bates to Rothery and forwarded to Reedy, Bates lists numerous files allegedly from the KeyZ and ClicZ directories on the Landslide servers that contain the September 8, 1999 date-time stamps. (Reedy App., Exhibit M at 49-52.) In another e-mail from Bates to Rothery, Bates alleges that he discovered over 42 entries of attempts to restart the computers which occurred after the seizure of the computers. (Reedy App., Exhibit O at 57.) Bates contends that this shows "the dates and times" of these files "had been seriously compromised" and "was largely the result of running a number of backup routines [that] by their nature altered the

dates associated with [the] files." (Reedy App., Exhibit I at 34.) Reedy also supports these claims with an Exhibit N, alleged to be "Watchdog Log Reports" that list numerous times the servers were allegedly restarted in the two days after they were seized on September 8, 1999. (Reedy App., Exhibit N.) Rothery provided an unsworn "statement" to Reedy in which he writes that "[o]ur forensics evidence indicates that the 'Click Here Child Porn' banner did not exist on the Landslide homepage as alleged in the Landslide trials."[15] (Reedy App., Exhibit J at 41.)

This allegedly new evidence from Bates and Rothery is incomplete and unsubstantiated. According to Bates's January 2010 "Computer Forensics Report," he writes that he was given "copies of the main Landslide computers" in September 2006, and has been examining and analyzing these files since that time." (Reedy App. at 31.) He states he "inspected copies of backup tapes from" counsel Ball, but that his "investigation of the servers of Landlside, Inc. is ongoing." (*Id.* at 31, 46.) Rothery similarly "obtained the Landslide subscriber database and other related evidence" from Ball in August 2006 and, since that time, "carried out three years of forensics analysis and investigations of the

---

[15]The Court notes that Reedy has provided several exhibits that are unrelated to the issue that the court of appeals authorized him to address, including exhibits C, D, and F. Thus, none of these exhibits has been considered. In particular, Reedy argues that Exhibit C, an analysis of "Nympho," also known as "Lolita World," was removed from KeyZ weeks before the government raid, and that evidence of its removal would have shown that he shut down a site after learning of illegal content. (Reply at 3-4, 7.) But in no instance has Reedy related the alleged record about Nympho as being discovered through analysis of the allegedly corrupted servers. Thus, Exhibit C and Reedy's arguments about a shut down of "Nympho," are not within the scope of the successive § 2255 motion.

subscriber database and related Landslide computer records and logs." (*Id.* at 41.) Thus, the reports, emails, and affidavits from Bates and Rothery reveal that the only computer evidence that they have subjected to analysis were the copies of computers and servers seized at the Landslide business address.

The evidence at trial, however, showed that two computers were also seized at the Reedy's home: a desktop and laptop computer. (Trial Transcript (Tr.) Volume III at 398-405, 456-57, 481-82.) Neither Bates nor Rothery claim that they examined these two computers, and it is doubtful that they would have since they contained images of child pornography. (Tr. Vol. III at 461-67, 482-83.) As such, the "forensic" examinations done on the copies of the computers and servers from the Landslide business office, have no impact on the evidence found on the computers seized from the Reedy's home.

The evidence from the home computers included Landslide banner graphics, which showed Reedy used the home computers for his Landslide business. (Tr. Vol. III at 463-65, 469-80, 483-85.) Janice Reedy admitted to agents that both she and Thomas Reedy conducted Landslide business from the house. (Tr. Vol. III at 586.) In addition to the home computers' containing images of child pornography, they also included email messages between various Landslide.com email addresses, webmasters of child-pornography websites, and subscribers to the child pornography sites, all of which involved discussion of the availability of and the money to

be made from child pornography. (Tr. Vol. III 469-479, 482-85.) The home notebook computer contained 30 pages of adult-classified material from Landslide's classified ads where people discussed child pornography, sought to trade Keyz password access to child-pornography sites, and sought to have sexual contact with children. (Tr. Vol. III 483-85; Vol. II 193-94.) These same 30 pages were also found on the Landslide servers. (Tr. Vol. III 484-85.) None of this evidence is affected by the evidence of alleged date-time stamp corruption on the Landslide office computers and servers.

Rothery's claim that his "forensics evidence indicates that the 'Click Here Child Porn' banner did not exist on the Landslide homepage as alleged in the Landslide trials" is unsubstantiated. (*Id.* at 41.) Rothery does not describe the "forensic evidence," he does not provide the "forensic evidence," he never explains the "forensic analysis and investigations" he claims was performed on Landslide's subscriber database and related computer records and logs, and he does not explain how his "forensic evidence" proves the 'Click Here for Child Porn' hyperlink banner did not exist on Landslide's homepage.

Detective Steve Nelson, a member of the Dallas Police Department's Child Exploitation Unit, testified at trial regarding his several different instances of under-cover recording of materials off of the Landslide websites in April, June, and August of 1999. Nelson testified that the 'Click Here for Child Porn' hyperlink banner was on the Landlside home page, and "showed up

quite frequently in a bunch of places." (Vol. II 188-89, 170-72, 210, 268, 284, 292.) Nelson also showed the jury the numerous 'Click Here for Child Porn' hyperlink banners that were on several of Landslide's webpages with the real-time recordings and captures of his visits to those webpages. (*Id.*) On cross-examination, Nelson said the 'Click Here for Child Porn' hyperlink banner "was always there and then it just disappeared one day. I never saw it again." (Vol. III at 292.) Detective Nelson's testimony and real-time recordings and capture of his visits to Landslide's webpages in the months preceding the seizure of Landslide's computers and servers, conclusively refutes Rothery's unsubstantiated claim that the 'Click Here for Child Porn' hyperlink was not present on Landslide's homepage.

Further, all Bates offers is speculation about the alleged corruption. While Bates alleges some of the "dates and times of the files" on the Landslide servers "had been seriously compromised before any of the backup tapes were prepared," he states, "I believe that this contamination was largely the result of running a number of backup routines [that] by their nature altered the dates associated with files." (Reedy App. at 34.) Bates goes on to state "I have no reason at this stage to suspect that file content generally was modified by these routines . . . . (*Id.*) But he also acknowledges that "such contamination raises the possibility that the files could have been changed (deliberately or accidentally) and further reduces the reliability of any evidence." (Reedy App.

at 59.) He also acknowledges that he does not know whether the corruption alleged to be apparent on the copies exists on the original evidence. (*Id.* at 57, 59.) Bates also reports that his review of one of the copies of computer drives shows that every one of the files was contaminated to some degree, and that an average of over 64% of the files contained date-time stamp contamination, but he cannot state definitely what he believes caused the alleged date-time stamp corruption. (*Id.* at 58, 60.) Instead, he speculates the date-time stamp contamination resulted from either (1) a "backup process [that] did not correctly collect the information in certain instances"; (2) a "restore process [that] did not correctly restore file information in certain instances"; (3) some "files on Landslide computer were damaged"; or (4) some of the files "were copied, modified and then replaced on the Landslide machine using a restore process which produced the chronological effect of an intrusive backup procedure." (*Id.* at 60.) Bates conceded "[a]t this stage it is not possible to reliably decide amongst [these] possibilities." (*Id.*)

In another email, Bates allegedly identifies numerous files from the "Keyz and ClickZ directories" on the Landslide servers that contain "corrupted external date-time stamps." (*Id.* at 49-52.) Once again, Bates does not state that the date-time-stamp alleged corruption had any effect on the content of these files. Rather, Bates acknowledges that the "absence of reliable dates and times has made it . . . difficult to draw any reasonable conclusions

concerning the presence or absence of specific files." (*Id.* at 34.)
Bates makes no effort to reconcile this speculation about the
copies of Landslide computers with the overwhelming evidence
presented at trial that was gathered by Detective Nelson
independent of the Landslide office computers.

*Whether Reedy's "New" Evidence Shows that No Reasonable
Factfinder Would Have Found him Guilty*

Bates and Rothery investigated the evidence of the alleged
corruption of the copies of Landslide computers not for the purpose
of proving Reedy's innocence, but instead as a part of their
involvement in assisting with the defense of numerous persons
prosecuted in the UK subsequent to Reedy's trial. Bates's and
Rothery's investigations sought to show either these people did not
realize they were purchasing access to child pornography through
Landslide, or they were the victims of credit-card fraud and
identity theft.

The evidence presented to the jury during the trial of this
matter conclusively proved Thomas Reedy knowingly and intentionally
sold subscription access to child-pornography websites. Detective
Nelson testified that on various dates in April, June and August
1999, he visited numerous child pornographic websites and bought
subscription access to those sites through Landslide. (Tr. Vol. II
at 144-45, 153, 159, 172-73, 186-87, 197-98, 206-07, 209, 213, 217-
19, 223, 225-26, 235, 238-39, 240, 244, 249, 255, 257.) Nelson
assumed an undercover persona, and he employed a hardware device
and a software program to capture on VHS videotape and on computer

disk everything he saw and did in real time. (Tr. Vol. II at 157, 160, 162.)

The videos and captures were admitted into evidence and, while the jury watched the videos and viewed the captures, Nelson explained how he visited the child pornography websites and purchased access to them in each instance through Landslide.com. (Tr. Vol. II at 144-45, 153, 159, 172-73, 186-87, 197-98, 206-07, 209, 213, 217-19, 223, 225-26, 235, 238-39, 240, 244, 249, 255, 257.) Nelson's videos and screen captures showed the jury that on many of Landslide's webpages were 'Click Here for Child Porn' hyperlink banners. (Tr. Vol. II at 170-72, 177, 188, 193-94, 210, 268, 284, 292.) The evidence presented through Nelson also showed the same or similar banners stating 'Click Here for Child Porn' on the child pornography websites, which linked back to Landslide's KeyZ webpage to purchase access. (Tr. Vol. II at 174, 184, 196, 201, 268, 291-92, 303.) Detective Nelson bought access to many of these child pornography sites through Landslide's Keyz site, each time receiving a confirmation email from Landlside. (Tr. Vol. II at 198, 206-07, 209, 212-13, 216-18, 219, 223, 226, 233-35, 238-39, 244, 249-50, 255, 257-58; Government Exhibits SN-B-3, SN-C-3, SN-D-3, SN-E-3, SN-G-3, SN-I-3, SN-J-3, SN-K-3.) The emails he received back from Landslide were admitted into evidence. (*Id.*) Detective Nelson produced his credit-card bills showing that the billing from "Landslide Productions, Fort Worth, Texas," for his subscriptions to the child-pornography sites. (Tr. Vol. II at 262-63; Government

Exhibits SN-L-1, SN-L-2, SN-L-3.) The Landslide Sun-2 server contained the "subscription records relative to Steve Nelson's undercover purchase of web sites from Landslide." (Tr. Vol. III at 512.) All of Detective Nelson's visits to Landslide and his purchase of subscriptions to the child pornography site through Landlside occurred **before** the government seized Landslide's computers and servers on September 8, 1999.

Reedy argues, however, that all of the evidence produced by Nelson at trial had a locus in the Landslide database. (Reply at 5.) This is not true. Although evidence retrieved from the Landslide office computers was introduced to verify and confirm the evidence presented by Detective Nelson, this does not change the fact that the bulk of the evidence presented by Nelson was independently gathered, recorded and presented to the jury. Reedy also recounts the testimony of Dane Ritcheson, a computer forensics expert for the United States Postal Service regarding his inspection of all five computers related to the Landslide investigation, and his testimony regarding images of child pornography from one of the home computers (Tr. Vol. III 456-68), emails (Tr. Vol. III 468-80), banner graphics (Tr. Vol. III 482-83), and AVS adult-classified matter on the home computer (Tr. Vol. III 485-86.) Reedy contends that:

> with the uncorrupted server evidence, [Reedy] could have
> impeached this witness with the data manipulation
> evidence denied him by the corruption. This testimony
> goes to the heart of the materiality and prejudice to
> [Reedy] at trial. This expert witness claims to have
> created backups of the Sun servers to maintain the

17

integrity of the seized evidence. Yet the program files as offered to the defense on those same servers all reflect a last modification date of the night of the raid and seizure. Any modifications made between the internal creation dates of each file and the seizure date and time are now gone as a result of the corruption. (Br. at 27.)

First, as noted before, much of the evidence Ritcheson testified about, as recited by Reedy above, was retrieved from the computers at the Reedy's home. Furthermore, as noted in the discussion above, Reedy's evidence has not shown that the date-time-stamp alleged corruption had any effect on the content of the files. Even if counsel Ball had inspected the computer servers and discovered the existence of a date-time anomaly, Reedy has not shown that any questioning of Ritcheson relating to that matter, would have diminished or undercut Ritcheson's testimony about the files otherwise found on the computer servers.

Lastly, in addition to all of the evidence recounted and discussed above, the jury heard from United States Postal Inspector Steve Huggins. Inspector Huggins told the jury that, during an interview with Thomas Reedy conducted several days after the seizure of evidence, Reedy admitted that he and his wife, Janice Reedy, knew that some of the websites they sold subscriptions to contained child pornography, that child pornography represented thirty to forty percent of his business, and that child pornography was "growing and he knew that that's where most of his money was coming from." (Tr. Vol. III at 602, 597-602.) Reedy admitted Landslide sent $500,000 in wire transfers and $140,000 in checks to webmasters each month. (Tr. Vol. III at 599.) Reedy also admitted

that he developed the AVS and KeyZ systems, and the ClickZ system for the movement through the adult-classified system. (Tr. Vol. III at 599-600.) Reedy also acknowledged viewing child pornography, though he claimed to Inspector Huggins that he did so only afer receiving a complaint about a child-pornography website. (Tr. Vol. III 601.) As to the complaints routed back to Reedy from his customer-service staff persons, Reedy would view what was on the site and then tell his employees to advise the complainant to contact his local police; but he would leave the site available. (Tr. Vol. III, 601.) And in support of a count of possession-of-child-pornography material, the jury was presented evidence that Reedy organized his own images of child pornography and loaded them through the "Paint Shop Pro Program," in order to compress images into thumbnail size and thereby allow many images to be viewed within that program.(Tr. Vol. III at 466-67.)

Thus, in light of the evidence gathered by Detective Nelson, the evidence found on the Reedys' home computers, and Thomas Reedy's own admissions, Reedy cannot clearly and convincingly show that had Ball inspected and had examined the copies of the computer servers and provided such evidence to the jury, that no reasonable factfinder would have found him guilty. As Reedy has not satisfied the conditions required under 28 U.S.C. § 2255(h)(1), this Court is compelled to dismiss the successive § 2255 motion under 28 U.S.C. § 2244(b)(4).

*Order*

19

All grounds for relief recited in Reedy's June 12, 2012, brief in support of the motion under § 2255, except the ground that Reedy received ineffective assistance of counsel based upon his counsel's failure to inspect copies of the computer servers provided by the government during discovery, are DISMISSED as filed without permission of the court of appeals.

Thomas Reedy's successive motion for relief under 28 U.S.C. § 2255 on the ground that Reedy received ineffective assistance of counsel based upon his counsel's failure to inspect copies of the computer servers provided by the government during discovery, is DISMISSED WITH PREJUDICE.

*Order on Certificate of Appealability*

Federal Rule of Appellate Procedure 22 provides that an appeal may not proceed unless a certificate of appealability (COA) is issued under 28 U.S.C. § 2253.[16] Rule 11 of the Rules Governing Section 2255 Proceedings now requires that the Court "must issue or deny a certificate of appealability when it enters a final order adverse to the applicant."[17] The COA may issue "only if the applicant has made a substantial showing of the denial of a constitutional right."[18] A petitioner satisfies this standard by showing "that jurists of reason could disagree with the district court's resolution of his constitutional claims or that jurists of

---

[16]*See* Fed. R. App. P. 22(b).

[17]RULES GOVERNING SECTION 2255 PROCEEDINGS IN THE UNITED STATES DISTRICT COURTS, RULE 11(a) (December 1, 2010).

[18]28 U.S.C.A. § 2253(c)(2)(West 2006).

reason could conclude the issues presented are adequate to deserve encouragement to proceed further."[19]

Upon review and consideration of the record in the above-referenced case as to whether movant Reedy has made a showing that reasonable jurists would question this Court's rulings, the Court determines he has not and that a certificate of appealability should not issue for the reasons stated in this order.[20]

Therefore, a certificate of appealability should not issue.

SIGNED February 27, 2013.

_Terry R. Means_

TERRY R. MEANS
UNITED STATES DISTRICT JUDGE

---

[19]*Miller-El v. Cockrell,* 537 U.S. 322, 326 (2003)(citing *Slack v. McDaniel,* 529 U.S. 473, 484 (2000)).

[20]*See* Fed. R. App. P. 22(b); *see also* 28 U.S.C.A. § 2253(c)(2)(West 2006).